**BURSOR & FISHER, P.A**.
Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ndeckant@bursor.com
            lsironski@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.J., C.D., C.B., and D.F., individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ASHLYNN MARKETING GROUP, INC., <br><br> Defendant. | Case No. 3:24-cv-00311-GPC-MSB <br><br> **DECLARATION OF NEAL J. DECKANT IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION** <br><br> Judge: Hon. Gonzalo P. Curiel <br><br> Magistrate Judge: Hon. Michael S. Berg |

I, Neal J. Deckant, hereby declare:

1.     I am a partner of the law firm Bursor & Fisher, P.A., an attorney licensed in the State of California, duly admitted to practice before this Court in this matter, and counsel of record for Plaintiffs. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto. I make this declaration in support of Plaintiffs' Reply in Support of their Motion for Class Certification.

2.     I previously filed a Declaration in support of Plaintiffs' Motion for Class Certification attaching and authenticating exhibits. I hereby reaffirm and adopt the contents of that Declaration as if fully set forth herein.

3.     All exhibits attached to my prior Declaration are true and correct copies of the documents they purport to be. Each exhibit was produced in discovery, obtained from a public filing, or is otherwise a business record or document of which I have personal knowledge of its authenticity.

4.     Attached as Exhibit 1 is a true and correct copy of excerpts of the transcript of the March 12, 2026, deposition of Kirsten Elin Smith, Ph.D.

5.     Attached as Exhibit 2 is a true and correct copy of excerpts of the transcript of the January 14, 2026, deposition of Plaintiff C.B.

6.     Attached as Exhibit 3 is a true and correct copy of excerpts of the transcript of the January 22, 2026, deposition of Plaintiff D.F.

7.     Attached as Exhibit 4 is a true and correct copy of excerpts of the transcript of the January 21, 2026, deposition of Plaintiff C.D.

8.     Attached as Exhibit 5 is a true and correct copy of the Reply Declaration of Andrea Lynn Matthews, Ph.D.

9.      Attached as Exhibit 6 is a true and correct copy of the Reply Declaration of Daniel Overbeek, MD.

10.     Attached as Exhibit 7 is a true and correct copy of the Reply Declaration of William Robert Ingersoll, Ph.D.

11.   Attached as Exhibit 8 are Plaintiffs' proposed class definitions.

I declare under penalty of perjury under the laws of the State of California that the above and foregoing is true and accurate.  Executed this 19th day of March 2026, at Walnut Creek, CA.

Respectfully submitted,

_____

Neal J. Deckant

2

**EXHIBIT 1**

# Deposition Transcript

Case Number: 3:24-cv-00311-GPC-MSB

Date: March 12, 2026

**In the matter of:**

# J.J., et al. v ASHLYNN MARKETING GROUP, INC.

# KIRSTEN ELIN SMITH, PH.D.

Reported by:
Mary Jacks



Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

J.J., C.D., C.B., and D.F.,

individually and on behalf of all those

Similarly situated,

  Plaintiffs,

    V                Case No: 3:24-cv-00311-GPC-MSB

ASHLYNN MARKETING GROUP, INC.,

  Defendant.

_____

30(b)(1) DEPOSITION OF

KIRSTEN ELIN SMITH, PH.D.

THURSDAY, MARCH 12, 2026

BE IT REMEMBERED THAT, the 30(b)(1) deposition of Kirsten Elin Smith, Ph.D., was taken before Mary Jacks, Court Reporter and Notary Public, on Thursday, March 12, 2026, commencing at the hour of 9:00 a.m., via Zoom.

APPEARANCES

Appearing via Zoom on behalf of the Plaintiffs:

Bursor & Fisher, P.A.

Luke Sironski-White

1990 North Carolina Boulevard

9th Floor

Walnut Creek, California 94596

925-300-4455

Lsironski@bursor.com


Appearing via Zoom on behalf of the Defendant:

Snell & Wilmer LLP

Rachel Anne McMains

600 Anton Boulevard

Suite 1400

Costa Mesa, California 92626

714-427-7000

Rmcmains@swlaw.com

own every word of it, but this was a collaborative effort with people who had very different backgrounds and training and understanding of things than I do. And so what you see here in this letter is very much a kind of meeting in the middle of different orientations to understanding things like addiction, for instance.

So all that to say I would not write the letter as it currently is if I were to sit down and write that letter today.  So to like -- to rewrite it in real time with you is not -- I mean, we can do that, but it's going to take a while.  So it would -- it would be a very different -- it would have a different, I think, emphasis, and I think that there would be a lot more equivocation maybe is a way to put that.

MR. SIRONSKI-WHITE:  Right.  And I am going somewhere with this, Rachel.

But broadly speaking, is it fair to say that you believe that 7-OH products should bear a label advising consumers that chronic consumption may lead to physical dependence and withdrawal?

MS. MCMAINS:  Objection to being outside the scope of this case and the assignment.

Dr. Smith, you can answer.

DR. SMITH:  I think it's accurate to say that a 7-OH product as of today should have some label indicating the potential for tolerance and withdrawal, which is what you -- which is the two symptoms that comprise physical dependence.  I think that that is a fair thing.

BY MR. SIRONSKI-WHITE:

Q.  Understood.  And you're aware that Krave Kratom sells 7-OH products?

A.  I became aware of that in the course of reading the materials for this case.

Q.  Do you believe that regular kratom products should bear a similar warning on their label?

A.  At this point, I think it is fair to say that it's very similar to 7-OH.  I think tolerance and withdrawal potential upon regular use is something that could be put on a label.

I do not think addiction should be put on the label for either, just to be very clear.

Q.  And this is your use -- rather your definition of the word of addiction, which is severe substance use disorder; correct?

A.  Well, even if we take NIDA's definition of addiction or any -- we could insert all the definitions of addiction and put them all up on the

table for consideration and I don't think we should be using that term for any of these. Whatever the operationalization of addiction is, even if we get outside the DSM-5 severe SUD and we go into something else, I would still stand by that.

Q. Okay. I'm wrapping my head around that. Give me a moment here.

Is there -- do you believe that addiction has a different meaning colloquially amongst laypeople?

MS. MCMAINS: Vague. Objection to vague.

DR. SMITH: Do you mean laypeople who have experienced addiction or laypeople who have not experienced addiction?

BY MR. SIRONSKI-WHITE:

Q. Fair question. I mean the American public at large.

A. I think this goes back to what we talked about earlier. There's -- you know, there's kind of this more squishy general definition that is more kind of like a bumper sticker, and then there's a definition that is much more technical and scientific and clinical. However, even among laypeople, whether they've had an addiction or not, and this is evidenced in the plaintiffs' in this case even, they have different definitions of addiction.

DR. SMITH:  Romeu.

MR. SIRONSKI-WHITE:  Thank you.  And the, I'm assuming, Smith study, but there's no -- is it the Hill, et al., study?

DR. SMITH:  Yeah.  So, I mean, I think we can only talk about what data we have, so I don't -- I don't love the idea of saying that our survey data or the case report literature or the social media data or whatever speaks for the majority of the population of kratom using adults in America.

So I don't think I can answer your question based on how it's asked.

BY MR. SIRONSKI-WHITE:

Q.  That's fair enough.  I understand it is ultimately your opinion in this report that a warning on kratom -- like, warning on the label of Krave's kratom products advising consumers that the product is potentially addictive is not warranted at this time; is that correct?

A.  That's correct.

Q.  Okay.  But earlier, you know, you stated that -- and correct me if I'm wrong here -- that a label advising consumers of the possibility of physical dependence and withdrawal may be warranted; is that correct?

A.   I think at this time point, physical dependence that includes tolerance and withdrawal, that would be something I think could be added.

Q.   Okay.   So is -- is the -- I use the word hang-up, but is your hang-up in your report on the use of the word "addiction" in a warning label?

A.   And habit forming, yes.

Q.   And habit forming, okay.

That cuts around quite a few of my questions.

Do you believe that such a warning should be on the front of the label or on the back of the label?

MS. MCMAINS:   Objection as to outside the scope.

But you can answer, Dr. Smith.

DR. SMITH:   So this is where I'm going to say it's not, like -- it is not my area of expertise to design labels on commercial products, and I am not a product liability expert.   So I'm going to say I'm not sure.   You know, I'll stay in my lane on this one.   You know, and there's probably someone much better qualified to decide where a certain warning should be, how big it should be, what are all of the other things that go into labels.

BY MR. SIRONSKI-WHITE:

Q.   Fair enough.

KIRSTEN ELIN SMITH, PH.D.
MARCH 12, 2026

JOB NO. 2477374

A.   Yes.  For some, I believe that is absolutely the case.  And, you know, ultimately in the full reading of my report, I also talk about how many people don't read the label anyway.

I mean, there is a lot of different realities that are all true, and I think it's fair to say that for some people the benefits are perceived as profound and might not carry as much weight.  That doesn't mean a warning label shouldn't be there for certain things, right?  Like we've already talked about tolerance and withdrawal, for instance.

Q.   Right.  Sorry to interrupt you.

And that's kind of what I wanted to get at, right, is I think there may be a misconception -- not a misconception, but I just want to make it -- want to straighten this out.

Do you believe that consumers purchasing kratom products should be able to make a -- do you believe that consumers when purchasing any product should be able to make a fully informed purchasing decision?

MS. MCMAINS:  Objection.  Vague.

You can answer.

DR. SMITH:  I think it's not --

MS. MCMAINS:  And outside the scope.  Sorry.

KIRSTEN ELIN SMITH, PH.D.
MARCH 12, 2026

JOB NO. 2477374

DR. SMITH:  I mean, ultimately this is assuming, I think, a world that is just a little different than the actual world that we live in insofar as we don't have perfect information about most things, and even if we did, there's literally not enough time in a person's day to be fully informed about every purchasing decision they make. I just don't think that's realistic or coherent.

So, you know, in a perfect world would everyone be fully informed about everything and be this rational, reasonable actor?  Well, heck, yeah, they would.  But, like, that's not the world we live in.

And I do think that for commodities like kratom or phenibut or other things that have been used by some of the plaintiffs, like, you know -- I guess in this -- you know, many of the first people who started using kratom in America didn't have any labels, like at all.  Like, they were ordering things from Asia directly with no labels.

So I think that people ultimately are trying their best with imperfect information to meet their needs and that is my -- you know, that is a through-line to all of my research is that the people I've studied are really trying to meet their needs in

KIRSTEN ELIN SMITH, PH.D.
MARCH 12, 2026

JOB NO. 2477374

whatever way they can and, oftentimes, without perfect information.

Q.   I completely agree, and my question was very poorly worded so I'll take -- I'll take the hit for that.

It seems like you agree that, you know, a warning disclosing -- you agree that people should be informed that regular use of kratom poses a risk of physical dependence and withdrawal?

A.   I think -- oh, sorry.

Q.   Oh, no, no, that was my statement.

A.   I mean, I -- well, I agree that the potential for tolerance and withdrawal to develop, at this point in time, I think we have data.  I'm not sure that ten years ago we did, so let me just make that really clear.

But at this point in time, I do think that tolerance and withdrawal could be added along with many other things of which the risk might be very, very small but at least possible, like, dizziness, you know, or -- you know, there are just certain things that I think is probably better just to err on the side of caution even if we don't have great data or a higher probability outcome.  It's probably better just to err on the side of -- of certain

cautions.

Q.  Right.  And I think this boils down to that when you go into a grocery store you don't expect the product that you are buying to pose a risk of physical dependence and withdrawal; right?

MS. MCMAINS:  Objection to the form of that question and vague.

BY MR. SIRONSKI-WHITE:

Q.  Is it assumed that the groceries you purchase from the grocery store are not habit forming or --

MS. MCMAINS:  Objection to "grocery."  I'm not being difficult but there's all kinds of things, alcohol and nicotine at the grocery store.

MR. SIRONSKI-WHITE:  Fair enough.

BY MR. SIRONSKI-WHITE:

Q.  When you go and buy a can of tomatoes, do you expect that it should have, you know -- are you assuming that it has a risk of dependence?

A.  Not tomatoes, but I would say there are plenty of other things in the grocery store that one can purchase that are not alcohol and nicotine that absolutely have an addiction potential.  And I don't know that we need to put an addiction label on those.

And I am very -- I mean, we don't need to, like, get down the sugar road, but, like, we could

when we had the first social media based paper talking about how some people might have experienced tolerance and withdrawal. But, again, it was not, you know -- that's about it.

Q. Okay. So earlier you testified, you know, in 2026 -- I believe you said that, you know, there could be a warning label on the product about tolerance and withdrawal; is that right?

A. Correct.

Q. In 2020, did you have that same opinion based on just what you knew in 2020 and before?

A. No. I think for the first, like, decade, I mean, like, we barely were understanding why people were using kratom even in 2017. We were struggling to, like, get that part down.

So, no, I don't think there was a clear or even a burgeoning understanding of tolerance or withdrawal or, you know, substance use disorder development and, you know, anywhere from, like -- I mean, it's only been I would say within the last couple years that our use -- or that our understanding has grown.

Sorry. That was a long answer.

Q. No. You're good.

So just to clarify, so your opinion with respect to whether there could be a warning about

tolerance and withdrawal in 2026 is different than what it would have been in 2020?

A.   Yes.  Sorry.  Yes.

Q.   And then -- oh shoot.

And just to be clear, it is not your opinion that the words "addiction" or "habit forming" should be on the product label for kratom products; is that right?

A.   Yeah, it is my opinion that "addiction" and "habit forming" should not be on kratom products as of today, in my opinion.

Q.   And we talked about the definition of "addiction" earlier.  And when you say -- when you're talking about tolerance and withdrawal with respect to a label, that tolerance and withdrawal does not equal to addiction for you; is that right?

A.   No, addiction is a broader construct that has a couple different ways of defining it, but even if we stick to the DSM-5 definition of severe substance use disorder for kratom as being addiction operationalized for this case, even then we still cannot necessarily say that because if we have only tolerance and only withdrawal and we take them together, we're still getting at, like, a mild use disorder, which, again, is not reflective of

addiction.  So by either avenue, it's not getting us there.

Q.  And we talked about this a little -- or Luke and you talked about this earlier with the Matthew's report specifically, and you do address the Matthew's report in your report.  But is it your opinion that the label proffered in the Dr. Matthew's report is -- is inaccurate?

A.  Yes.

Q.  And then I just want to break it down a little bit.  We talked about how your opinion has changed between 2020 and 2026.

Is it possible for you to go, you know, year by year and talk about how -- how that changed?  I know this is really broad.  We can -- you know, if we can pull up surveys or anything like that that would help your memory, but just understanding how that's changed 2021, 2022 and so on.

A.  I think a parsimonious way or what I would offer is that I don't think that in 2020 we had an opinion, right?  Like you -- you asked had my opinion changed.

I guess, like, there's this sort of -- we didn't -- put simply, like, we didn't have enough information to really have an opinion, if that makes

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA


J.J., C.D., C.B., AND D.F., INDIVIDUALLY AND ON BEHALF
OF ALL OTHERS SIMILARLY SITUATED,

     PLAINTIFFS,


V.               CASE NO. 3:24-CV-00311-GPC-MSB


ASHLYNN MARKETING GROUP, INC.,

     DEFENDANT.




DEPONENT:   C.B.



TAKEN:     JANUARY 14, 2026



REPORTER:   DANNIELLE COPELAND
           REGISTERED DIPLOMATE REPORTER
           CERTIFIED REALTIME REPORTER
           CALIFORNIA CSR 14444



STENOGRAPHICALLY REPORTED REMOTELY VIA ZOOM
VIDEOCONFERENCE




JOB NUMBER 124538

**C.B**

**January 14, 2026**

Q.    Oh, you've spent thousands on both, is that what you said?

A.    **Yeah.**

Q.    Okay.  And since you started using 7-hydroxy, how much do you think you've spent on 7-hydroxy?

A.    **Well, you figure they're like 45 to $66 a pack, and I -- I have to buy one every day.  So I don't know, let's just minimize and say 45 times -- you know, every day times seven days, that's a lot.**

Q.    Times a year, right?

A.    **Yeah.  And you want -- and I always want the more expensive pack because it's a higher dosage, so that's at least $50 a pack.  And that's every day.**

Q.    Okay.

ATTORNEY YOUNG:  I want to show you an exhibit.  This is Exhibit 5 from the December 15th, '25, deposition of Wes Saliman that I will load up for you.

(PREVIOUSLY MARKED SALIMAN EXHIBIT 5 WAS INTRODUCED FOR THE RECORD.)

**THE WITNESS:  Excuse me.**

ATTORNEY YOUNG:  It's not up yet.  I'm working on it.

///

C.B

January 14, 2026

BY ATTORNEY YOUNG:

Q.    Okay.  Do you -- do you see what's been previously identified as Exhibit 5 for W. Saliman 30(b)(6) deposition?

A.    I see the picture.

Q.    Okay.  You see a picture for Krave there, right?

A.    Uh-huh.

Q.    Does this look familiar -- does this look similar to the -- the label that would have been on the powder that you purchased throughout the time period?

A.    I've seen it before.

Q.    When you first purchased the Krave powder, did you -- did you read the label?

A.    Yeah, I read the label.

Q.    Okay.  And why -- why did you read the label?

Why was that important to you?

A.    Just to see if there was any- -- anything on it that I would be concerned about.

Q.    Okay.  Did you see anything that you would be concerned about?

A.    No.  It -- there was no warnings or labels, there was no like mus- -- there was nothing concerning, no.

C.B

January 14, 2026

may be habit forming and result in -- and cause dependence.  They do say that.

But my question to you is:  When you started buying Krave chewables, right, were you already -- would you consider yourself already hooked on kratom?

A.    Yes.

Q.    Okay.  Did you know when you first bought them that Krave chewables were, in fact, a 7-hydroxy product, or did you think they were just another form of Krave kratom or Krave extract?

A.    I thought it was a -- another form of Krave extract.

Q.    Okay.  So we talked earlier -- he -- you -- he asked you earlier about the shot -- the little shots with the tiny print on them that had the different colors.

A.    Uh-huh.

Q.    Those I think you established were the Krave extract -- Krave kratom extract shots.

Is that what you understood Krave chewables to be but in a chewable tablet form?

ATTORNEY YOUNG:  Objection, vague -- vague, form.

THE WITNESS:  I thought it was -- I thought it was the same thing but just like you pop it in your

**C.B**

**January 14, 2026**

mouth and go.

BY ATTORNEY BRADEN:

Q.      Right.  Okay.

So you thought it was a chewable pop-it-in-your-mouth tablet that was similar to the other Krave products you had taken in the past?

A.      Exactly.

Q.      You didn't -- did you know what 7-OH or 7-hydroxy was at that time?

A.      I didn't even know.

Q.      When did you first find out that Krave chewables were in fact 7-hydroxy or what 7 -- just that, when you found out Krave chewables were 7-hydroxy?

A.      It was actually when me and you were talking.  I didn't know about -- I didn't know they were different.

Q.      And how long ago was that?

A.      I would say the last few months.  I'm really bad at timelines.

Q.      Okay.  And by that time -- okay.

By that time that we spoke, how long had you been taking Krave chewables, about?

A.      I'd been taking them about a year.

Q.      Okay.  Would you -- would you have

**C.B**

January 14, 2026

EXAMINATION

BY ATTORNEY BRADEN:

Q.   C.B., you would never have bought Krave hydroxy chewables had you not already been using Krave kratom in the first place, right?

A.   **Correct.**

ATTORNEY YOUNG:  Objection, calls for speculation, foundation, incomplete hypothetical.

Go ahead.

BY ATTORNEY BRADEN:

Q.   Okay.  Do you understand that -- you said earlier you understood this case was for, you know, a refund, what Mr. Young called economic damages.

So given that, and I know you're not a lawyer, but just as -- as a common-sense matter, right, you -- you -- it sounds like you know the difference between a refund of purchase price and personal injury, correct?

A.   **Right.**

Q.   You kind of get the difference there?

Do you have any -- did you ever think that us suing for refunds would take away anyone's right to sue for a personal injury?

A.   **No.**

Q.   You -- you -- sorry, what -- you don't

**C.B**

**January 14, 2026**

what?

A.      Say it again.

Q.      So my question was -- it sounds like you knew that this case was about getting refunds, right?

A.      Yes, it is.  Uh-huh.

Q.      Okay.  So given that this case is about getting refunds, just as a common-sense matter, do you think that this case somehow stops anyone out there that's hooked on Krave or another kratom brand from -- from suing for not their refund but their own personal injury?

A.      I don't think it stops them.

Q.      Okay.

ATTORNEY BRADEN:  That's all I got.

ATTORNEY YOUNG:  All right.  I'm done.

THE VIDEOGRAPHER:  Okay.  Before I take us off the record, can I get transcript and video orders on the record?

ATTORNEY BRADEN:  We want -- sorry.  Go ahead, Andrew.

ATTORNEY YOUNG:  I was going to say expedited for us, please.  Not -- no video right now.

THE VIDEOGRAPHER:  Okay.

ATTORNEY BRADEN:  Yeah, we're -- we'll -- we'll want the transcript, but it doesn't need to be

**EXHIBIT 3**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

J.J., C.D., and D.F., individually and   )
on behalf of all others similarly   )
situated,   )
  )
                Plaintiff,   )
  )
      vs.   ) No. 3:24-
  ) cv-00311-GPC-MSB
ASHLYNN MARKETING GROUP, INC.,   )
  )
                Defendant.   )
_____)

DEPOSITION VIA ZOOM VIDEOCONFERENCE OF D.F.

Thursday, January 22, 2026

Reported stenographically by:
ANNA B. SACRIPANTI
CSR NO. 9533

JOB NO.: 124536

Q    Correct.

A    **In a case.**

Q    Was it like the front of the store? in the aisles?

A    **The front of the store.  It was like right there, yeah.**

Q    What did the packaging look like?

A    **It kind of looked like -- like supplement that you would see at CVS.**

Q    What color was it?

A    **I don't recall.**

MR. BRADEN:  Objection.  Vague.

BY MR. YOUNG:

Q    What was -- what was the form of it?  Was it capsules? powder? bottles? vials?  What does the packaging look like?

A    **I think they were capsules and powders.**

Q    What did you buy, if anything?

MR. BRADEN:  Objection.  Foundation.

**THE WITNESS:  Powder, powder.**

BY MR. YOUNG:

Q    Do you recall how much powder you bought?

A    **No.**

Q    Did you examine the package when you bought it?

A    **Yes.  Well, what do you mean by examine?  Did I**

**D. F.**

**January 22, 2026**

read it?

 Q Yeah.  Did you --

   (Overlapping speakers.)

   DEPOSITION OFFICER:  Okay.  You're overlapping right now.  One at a time, please.

   MR. YOUNG:  Okay.  I'll go.

 Q When you -- when you purchased the package, did you look at the package for any writing?

 A Yes.

 Q What did you see?

 A A normal label.  I'm sorry.  I don't understand.  I mean, I understand what you're asking, what do I see.  But specifically, like what were the words?

 Q Yeah.

 A Is that what you're asking?

 Q Yes.  To the best of your recollection, what were the words that you recall seeing on that package?

   MR. BRADEN:  Calls for a narrative.

   THE WITNESS:  Kratom, Krave.

BY MR. YOUNG:

 Q Anything else?

 A No, not -- not at all.

 Q So you just said Krave.  Do you recall seeing the word Krave on that?

**D. F.**

**January 22, 2026**

A    Uh-huh.

Q    Is that the first time you had learned of Krave?

**A    That day in the gas station?**

Q    Correct.

**A    Yeah.**

Q    I know you testified about it, but I just want to make sure it's clear.  So that day in the gas station in 2018, that was the first time you had ever heard of kratom at all?

**A    Yes.**

Q    Do you recall seeing any kind of label other than the brand name Krave?  Do you recall seeing any kind of label on that -- on the packaging?

**A    No.**

Q    Do you recall any arts that's may have been on the package?  So not words, but like pictures or art.

**A    I believe there was like perhaps like a leaf on it, maybe it said all natural.**

Q    Okay.  I'm going to show you a -- I'm going to show you an exhibit.  We'll do it two ways.  One is I'm going to drop it into the chat.  So if you look on the bottom, there's little button called chat, and it opens it up.

**A    Okay.**

**D. F.**

**January 22, 2026**

A    I have no way of saying for certain.

Q    Okay.  Now, you did say, at some point, you did start measuring it out.  Correct?

A    Yes.

Q    And at what point was that?

A    I -- I don't -- I'm sorry.  Repeat that.

Q    At what -- at what point during the consumption of kratom from 2018 to 2024 did you start measuring out the quantity of kratom that you were consuming?

A    I'm not sure exactly.

Q    Do you have any idea?

A    Maybe a year or two in.

Q    Do you recall why you started measuring it up?

A    I mean, no.

Q    When you first started taking kratom in 2018, did you talk to your doctor about it?

A    No.

MR. BRADEN:  Hey, Andrew, I think we're making pretty good time here relatively.  But I think it's been almost an hour.  Can we take five?  Or we can keep -- you can keep going with the label and then, if you want to, I'll just --

MR. YOUNG:  Yeah.  Let me finish this.  I think we've been going about 50 minutes.  So I'll go like another ten or less on the label and this specific area,

**D. F.**

**January 22, 2026**

and then we can break.

MR. BRADEN:  All right.  Fair enough.

MR. YOUNG:  I think I have a question pending, Madam Court Reporter.  Can you repeat it?

(Record read as follows:

"Question:  When you first started taking kratom in 2018, did you talk to your doctor about it?

"Answer:  No.")

BY MR. YOUNG:

Q   At any point from 2018 to 2024, did you talk to your doctor about kratom consumption?

A   No.

Q   At some point, did you reach a conclusion that you consider kratom to be dangerous?

A   Eventually.

Q   When did you reach that conclusion?

A   When I stopped taking it eventually, I had some adverse symptoms I couldn't explain.

Q   And what were those adverse symptoms?

A   Nausea and diarrhea, basically like a bad flu.

Q   Do you recall when that was?

A   During the pandemic.  I don't remember exactly.

Q   Did you say early pandemic? late pandemic?

A   I would say probably early pandemic, when the

**D. F.**

January 22, 2026

doors closed.

Q   And were those in connection with -- with consuming kratom or trying to stop taking kratom?  Or neither?

A   I'm sorry.  Was what in connection?

Q   The symptoms, the diarrhea and the nausea, were those in connection with while you were actively consuming it?  Or were you trying to stop, and you experienced those symptoms?

A   I could not get it.  So that's when I experienced the symptoms.

Q   Okay.  So you weren't taking it, and so that's fair.  So if you weren't taking it, then you started to experience those symptoms?

A   Yes.

Q   And you described it as flu-like?

A   Right.

Q   And how do you know it wasn't the flu?

A   I didn't have a fever.  I didn't have the flu. I just know I didn't have the flu.

Q   Did you have -- is it potentially you had COVID?

A   No.

MR. BRADEN:  Objection.  Expert opinion.

/ / /

**D. F.**

**January 22, 2026**

BY MR. YOUNG:

Q   Why -- why are you certain it was withdrawal and not COVID?

**A   It happened again after, you know, I tried to stop again later on.**

Q   Okay.

**A   And every time I didn't take it.**

Q   Got it.  So you tried to stop for the first time -- or you tried to stop -- you just hadn't stopped -- at some point in COVID because you didn't have access to it.  That's a fair summary of the first episode.  Correct?

**A   Yes.**

Q   And then at some point in the future, at least once, you tried to take quit kratom again.  Correct?

**A   Yes.**

Q   And then was there a second or third or fourth time you tried to quit kratom, or no?

**A   I couldn't say a number.  It took a few tries.**

Q   And each of those times that you tried to quit kratom, you experience what you characterize as withdrawal symptoms.  Correct?

**A   Yes.**

Q   And those withdrawal symptoms were nausea.  Correct?

**D. F.**

**January 22, 2026**

A    Yes.

Q    So when you -- when you saw it for the first time, discussed it with the clerk at the gas station, did you pick up the package at that time, like hold it in your hands?

A    **The very first time?**

Q    Correct.

A    **No.**

Q    So when -- when would have been the first time you would have actually held the kratom package in your hand?  Would it have been when you actually purchased it which would have been about a month-ish after you first came to know about kratom.  Right?

A    **Right.**

Q    And at that point, is that when the first time you would have had a chance to examine the package, flip it over, or read any labels that may have been on it?

A    **Yes.**

Q    During the period between when you first became aware that kratom existed and when you first purchased it, did you do any research on your own about kratom?

A    **Yes.**

Q    What did you do?

A    **I looked it up on the Internet.**

Q    And do you recall how you looked it up on the

**D. F.**

January 22, 2026

Internet?  Did you like, for example, did you use Google, Yahoo?  Walk me through that process.

A    **Normal search engine, probably Google.**

Q    Do you recall what search terms you put in?

A    **No.  I don't recall specifically.**

Q    Do you --

A    **Probably just kratom, kratom.**

Q    Do you recall whether you were putting Krave at that time?

A    **Like did I Google specifically Krave?  I believe -- yes, I did.**

Q    Okay.  What did you find from your search? First, let's just do kratom.  So when you searched kratom, do you recall what type of websites came up?

A    **Like forums, stuff like that.**

Q    Did you go look at any of those forums?

A    **Yes.**

Q    Do you recall where those forums were posted?

A    **No, not now.**

Q    Are you familiar with Reddit?

A    **Yes.**

Q    Do you recall if one of those forums was run -- was posted on Reddit?

A    **I believe so.**

Q    What was the general discussion of -- of kratom

**D. F.**

**January 22, 2026**

on that, on those forums?

A    **Just that it was very similar to coffee, that it was natural and people were generally saying positive things.**

Q    Do you recall whether anybody was saying negative things?

A    **Not that I saw.**

Q    What were the -- so the positive things were like it was like coffee, it was natural.  Anything else that you recall as positive?

A    **No.**

Q    Did you rely on those statement to inform your decision to buy kratom?

A    **Yes.**

Q    And you agree with me that those statements weren't being made by Krave.  Right?

A    **Yes.**

Q    Yes, you agree with me?

A    **Yes.**

Q    And do you know who was making those -- those statements?

A    **No.**

Q    Were they all just anonymous username kind of thing?

A    **Yes.**

**EXHIBIT 4**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


J.J., C.D., and D.F., individually and )
on behalf of all others similarly )
situated, )
 )
                    Plaintiff, )
 )
          vs.                          )   No. 3:24-cv-00311-GPC-MSB
 )
ASHLYNN MARKETING GROUP, INC., )
 )
                    Defendant. )
_____)




DEPOSITION VIA ZOOM VIDEOCONFERENCE OF C.D.

Wednesday, January 21, 2026









Reported stenographically by:

ANNA B. SACRIPANTI
CSR NO. 9533

JOB NO.: 124542

First Legal Depositions - Calendar@firstlegal.com
855.348.4997

**C. D.**

**January 21, 2026**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

J.J., C.D., and D.F., individually and on behalf of all others similarly situated,

                      Plaintiff,

     vs.                   )  No. 3:24-cv-00311-GPC-MSB

ASHLYNN MARKETING GROUP, INC.,

                      Defendant.

     Deposition Via Zoom Videoconference of

C.D., taken on behalf of Defendant, beginning

at 9:01 a.m., Wednesday, January 21, 2026,

stenographically reported by

ANNA B. SACRIPANTI, Certified Shorthand

Reporter, State of California, CSR No. 9533.

**C. D.**

**January 21, 2026**

APPEARANCES:  (Via Zoom Videoconference)

For Plaintiffs:

        BURSOR & FISHER P.A.
        BY:  LUKE SIRONSKI-WHITE, ESQ.
        1900 California Boulevard, Suite 940
        Walnut Creek, California 94596
        206-491-2207
        lsironski@bursor.com

For Defendant:

        SNELL & WILMER L.L.P.
        BY:  RACHEL A. MCMAINS, ESQ.
             ANDREW P. YOUNG, ESQ.
        3611 Valley Centre Dr., #500
        San Diego, California 92130
        858-434-5020
        rmcmains@swlaw.com
        apyoung@swlaw.com@swlaw.com

Also Present:

        ROB CHANG, Videographer

**C. D.**

January 21, 2026

BY MR. SIRONSKI-WHITE:

Q    People should make informed decisions before consuming addictive products?

**A    Yes.**

MS. MCMAINS:  Objection.  Vague.

BY MR. SIRONSKI-WHITE:

Q    I want to go back to the timeline we were talking about regarding your -- the start of your use of kratom when you realized you were addictive -- addicted, sorry, to kratom.

And correct me if I'm wrong, but you stated earlier that you started using kratom in 2019 during COVID.  But I can represent to you that COVID didn't really start until 2020.  So is it --

MS. MCMAINS:  Objection.  Misstates testimony.

BY MR. SIRONSKI-WHITE:

Q    Did you earlier state that you started using kratom in 2019 during COVID?

MS. MCMAINS:  Objection.  Misstates testimony.

**THE WITNESS:  I don't know if I exactly stated that.  I know that, in my mind, the way I keep -- I'm not great with dates or even years.  But I do know that the winter of COVID was when I started taking kratom. That's for sure.**

**And whether that's 2019 or 2020, winter**

C. D.

January 21, 2026

overlaps them both, that's when I -- that's when I equate with when I started taking kratom.

BY MR. SIRONSKI-WHITE:

Q   Okay.  So is it possible you have your use wrong in terms of when you started taking kratom and when you realized you were addicted to kratom?

MS. MCMAINS:  Objection.  Leading.

THE WITNESS:  Well, no.  I mean, when she -- yeah, I mean, I think I certainly am from just -- not wrong in -- certainly wrong in what we were -- what we were talking about earlier.  She showed me the date on that, on the complaint.  And I know that's accurate.

And whether I misstated earlier about when I realized about the addiction, I probably did.  But I know it was about a year of using kratom.

And COVID, we all lost our jobs.  I started a new job in 2021, and that was sometime in the spring-ish of 2021 when I started a new job after being unemployed as many of us were during COVID.  It was at that time period at that new job when I first felt the physical dependency because, at this new job, I just -- I didn't -- I didn't take kratom with me.

And all I can remember is specifically that day of like, "Wow, this sucks."  Like I need to go home, I need to get some kratom.  And that was after the kratom,

**C. D.**

**January 21, 2026**

unemployment, had a new job in 2021.

So if earlier I misstated about when I felt the addiction or realized that was addiction, addictive, as of March, February 2020, that was definitely incorrect. That's when I started kratom. It was close to that time period, winter of 2020, is when I started taking kratom. Whether that was -- yeah, at some point in winter of 2020.

BY MR. SIRONSKI-WHITE:

Q   And when you say winter of 2020, you just said --

A   That's true. It can't it be 2019. That's 2020. Go ahead.

Q   You just said March or April of 2020. Do you -- do you consider that to be winter of 2020?

A   For sure. In Tahoe, that's winter. We had -- that year, we had a snow storm of five feet on Memorial Day. So, yeah, that's winter.

MR. SIRONSKI-WHITE: Understood. Okay. That's all I have.

MS. MCMAINS: Okay. I have a few questions.

EXAMINATION (Resumed)

BY MS. MCMAINS:

Q   So earlier today you had testified that it was COVID time when you realized you were addicted to

**C. D.**

**January 21, 2026**

kratom.

A    I don't remember saying that.  I remember bringing up COVID near the end when I was trying to gather my timeline, when I was trying to ground my schedule of the whole process four or five years ago.

Q    Okay.  But we talked about at the beginning of the deposition, if you don't understand or you can't recall, you can just say that.  At the beginning of this deposition, you were, you know, giving me months and years.

What changed between when you first testified about that timeline to right now?  Your testimony changed.

A    Now, then, you showing me that the original deposition is when -- like I said, I started going back and seeing years, equating years with and dates with that process.

So nothing -- nothing really changed except when you're showing me that date.  And I was like, yeah, that makes sense because two thousand -- you know, I wasn't even -- 2018 is when I came to Tahoe.

2019, the winter of two thousand -- 2019 is when I started taking kratom.  And it was a period of time over taking kratom, and I'm at the next job that I had, and I know that this was described in my original

**C. D.**

January 21, 2026

when -- when the attorney and I were figuring out the whole timeline originally.  It was at that job which was 2021, when I started that job is when I noticed the symptoms, the physical symptoms.

Q    Okay.  And so you first started taking Krave kratom in 2019 at some point.  Is that right?

A    2019, 2020 is when -- it was that winter.  And I believe it would have been 2020 because -- I don't know.  It was in that winter, November, December, January, February, so 2019 or 2020.  Sometime over that winter before COVID -- of COVID, the winter of COVID.

Q    Is the first time you started taking Krave kratom.  Correct?

A    Yes.

Q    And I know we talked about this at the very beginning.  But has there ever been a time when you have been consuming Krave kratom that you've taken more than 30 capsules a day?

A    No.  I'm sure there had been specific days that I have like I tried to do three times a day and swerved my -- my standard dosage.  And that standard dosage has averaged out to be about ten, maybe eight at some point earlier, maybe 11 or 12 occasionally.  But I believe that the ten about three times a day is just the best average.

**EXHIBIT 5**

**UNITED STATES DISTRICT COURT**

**Southern District of California**

| | |
|---|---|
| J.J. and C.D., individually and on behalf of all others similarly situated, | 3:24-cv-311-GPC-MSB |
| Plaintiffs, | |
| - against - | |
| ASHLYNN MARKETING GROUP, INC., | |
| Defendant. | |

**REBUTTAL REPORT, ANDREA LYNN MATTHEWS, PH.D.**

1. This is a report by A. Lynn Matthews, Ph.D., to address various issues in a report offered by Mr. Rob Wallace in the matter of J.J., C.D., C.B., and D.F. v. Ashlynn Marketing Group, Inc. (U.S. District Court for the Southern District of California). The compensation paid for my time for the study and testimony in this matter is $500 per hour, regardless of the outcome.

2. In this report, I specifically, focus on Mr. Wallace's survey which was conducted to "determine if the relevant public...believe that the Defendant's brand claim is false and deceptive."

3. Mr. Wallace's consumer survey was not designed to accurately capture the likelihood of consumer deception arising from the absence of a warning label on the product package in three primary ways.

4. First, the survey uses an incorrectly specified population of interest: past users of kratom products who also indicate that they intend to purchase the product again, and who indicate that they are aware of what the active botanical ingredient "mitragyna speciosa" or "kratom" is. This is an overly narrow definition of the relevant target population.

5. Second, the survey incorrectly tests whether the label is likely to deceive consumers. Instead of assessing what consumers believe to be true about the product, the survey tests whether consumers believe that the label is false and/or deceptive. These constructs are fundamentally and profoundly different. Measuring

perceptions of a label's falsity does not speak to consumer misperceptions caused by the absence of a warning label.

6. Third, the survey incorrectly measures materiality by asking consumers about the impact on their purchase behavior of "any reported side effects" of kratom of which they are already aware, rather than testing the materiality of specific package claims or an omission thereof. This error is exacerbated by constraining the population to individuals who intend to purchase the product in the next 18 months.

7. Further, Mr. Wallace displayed in his report and in his deposition testimony a staggering level of statistical and methodological incompetence that calls into question his purported expertise as a survey researcher.

8. In sum, this survey is both utterly irrelevant and fails to meet basic scientific standards. It shows a severe fundamental misunderstanding of the nature of the matter at hand and the concepts that a consumer survey should be testing in this context, and fails to meet standards of the court for statistical competence.

# Mr. Wallace's Survey Incorrectly Specifies the Population of Interest

9. Mr. Wallace's survey incorrectly uses an overly narrow population of interest. Specifically, Mr. Wallace used the following screening criteria to obtain his sample, wherein respondents had to answer "yes" to all the following criteria:

   a. In the last 18[1] months, they had purchased a product that used mitragyna speciosa or kratom as an active ingredient,

   b. They planned to purchase a product that used mitragyna speciosa or kratom as an active ingredient in the next 18 months,[2] and

   c. They were aware of what the active botanical ingredient mitragyna speciosa or kratom was.

10. The proper survey population of interest includes the target population for the product. This properly includes all individuals to whom the product is marketed. Per

---

[1] There is a drafting error in this report such that the body of the report quotes the question as asking, "In the last 6 months..." while the screenshot of the relevant question asks, "In the last 18 months..." Mr. Wallace confirmed in deposition that he elected to make this change prior to fielding because he "wasn't sure if that $50 [discussed in the motion] was for per purchase or per year" (p 94, lines 22-25). and elected to extend his population beyond the 6 or 12 month window that is standard in marketing research. This arbitrary decision results in a nonstandard sampling frame.

[2] There is a drafting error in this report such that paragraph 18 states that respondents were selected who planned on purchasing kratom products again "in the next 6 months," paragraph 27 omits that participants needed to indicate that they planned to purchase again at all, and the screenshot of the relevant question states, "...and do you plan to purchase in the next 18 months?"

Diamond and Swann (2022), "A survey testing whether an advertisement likely misleads or deceives consumers should focus on those consumers to whom the ad is directed (i.e., the advertiser's potential customers)." (p. 41).[3]

11. It is my understanding that kratom is marketed to customers of pain relievers, herbal supplements, herbal medicines, and recreational drugs. These different perceived benefits and target market segments can be seen in the comments of Mr. Wallace's survey. For instance, one respondent to Mr. Wallace's survey indicated, "The pharmaceutical companies just don't like the fact that people like me can take Kratom instead of buying their synthetic painkillers they prescribe, so they end up losing money from the purchases." (p. 142) A second respondent indicates that it "seems like any other supplement similar to stuff in Walgreens." (p. 135). Another indicates that it's "a natural leaf that I've used to help with anxiety." (p. 87). A fourth respondent indicated that its purpose was "getting off of opiates with something natural and actually effective. It's not harmful, nor is it addictive in my personal experience/opinion." (p. 138).

12. Mr. Wallace's own survey shows the various benefits sought by individuals who purchased kratom. Thus, other individuals who are seeking these benefits, including an alternative to other pain-relief medication, over-the-counter supplements, natural medicines, and products to help get off of opioids, are in the target market for kratom. A survey that is designed to capture consumer perceptions of this product should therefore be targeted at all recent consumers of pain relievers, herbal supplements, herbal medicines, and recreational drugs, and not just past users of kratom who also intend to purchase the product again.

13. Past consumers of a product, especially those who indicate that they are aware of the active ingredients in a particular product, may have a fundamentally different perception and understanding of the product's labeling than those who are in the target market but have not yet purchased the product, based on their own personal experiences with that product. This is especially relevant given the claims at issue that the product is addictive: screening only for individuals who state that they have purchased and intend to purchase the product again would screen out individuals who have become addicted to the product but intend to stop using it. Individuals who intend to stop using the product due to its addictive nature may have very different perceptions of the deceptive nature of the label than individuals who intend to keep purchasing. Thus, a survey that only captures the perceptions of past

---

[3] Diamond, Shari Seidman, and Jerre B. Swann (2022). *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, Second Edition.* American Bar Association.

consumers of kratom who also intend to keep purchasing the product cannot be generalized to all members of the target market of kratom.

# Mr. Wallace's Survey Incorrectly Tests Consumer Deception

14. Mr. Wallace's survey asks respondents to "please review the following image of the back label of the Krave botanicals brand 500 mg powder product. Please read it with the same intention that you may have read it while purchasing this product. Based on your knowledge of the potential side effects of products that use kratom, do you believe that this information is false or deceptive?" Answer categories for respondents included, "Yes, the claim is false and deceptive," "No, the claim is NOT false and deceptive," and "Don't know."

15. The discrepancy between the question wording ("false or deceptive") and the answer wording ("false and deceptive") artificially increases the number of respondents who should answer "No, the claim is NOT false and deceptive" since none of the statements on the label are allegedly false. Specifically, this survey asks consumers to indicate whether they believe that a label is false and deceptive when it consists of truthful claims regarding the product (e.g. "Not deemed fit for human consumption by FDA. These statements have not been evaluated by the Food and Drug Administration").

16. This label is alleged to be deceptive, as it does not include a warning regarding the product's habit-forming nature. However, it is not alleged to be false. A statement that is false is fundamentally untrue. If a label contains only truthful information, but also fails to include vitally important information, it is reasonable for consumers still to conclude that the information present on the label is true rather than false. For instance, one can imagine a hypothetical candy product that is strawberry flavored, contains 100 calories, and contains a lethal amount of arsenic. If consumers were shown a label that indicated that the candy was 1) strawberry flavored and 2) contained 100 calories, and asked if this label was "false and deceptive," a reasonable answer is no: all claims made on the label were true, so while it is deceptive, it is not false AND deceptive. Thus, the question as written is designed to inflate the number of "No" responses given.

17. Even if Mr. Wallace had asked consumers whether the label was merely deceptive, however, it still would not be an accurate test of consumer deception in this matter.

18. Asking consumers whether they believe that a statement is deceptive is measuring what is known in academia as *perceived deception,* defined as "the consumer's

feeling that a marketer is responsible for trying to set false belief with any type of a marketing communication."[4]

19. In contrast, it is my understanding that consumer deception occurs when a company's representation, omission, or practice is found to be likely to mislead a customer, from the perspective of a consumer acting reasonably, and that the representation, omission, or practice is material (FTC Policy Statement on deception).[5] This form of deception is known as objective deception, and focuses on consumer beliefs about the product, rather than consumer perceptions that communications are false or deceptive.[6]

20. It is possible for consumers to perceive that a statement is deceptive when, in fact, it is legally correct. For instance, some consumers may not understand the legal definition of the term "Naturally Flavored," and perceive that the label of a "Naturally Flavored" strawberry breakfast bar is false and deceptive because its first flavoring ingredient is pears. This legally correct label thus might still result in consumer perceived deception.

21. Conversely, consumers may NOT perceive that a statement is deceptive if they in fact have untrue beliefs about the product. For instance, one respondent in Mr. Wallace's survey states that the side effects include "constipation," and indicated that "the reward is much greater than the possibility of slight constipation" (p. 106), indicating that the respondent is unaware of the product's habit-forming nature. If respondents have an incorrect belief about the product, that incorrect belief will drive whether they perceive the product label as being deceptive.

22. This is why standard practice for testing deceptive advertising in labeling contexts requires an experimental design that asks consumers what they believe to be true about the product in a condition that is allegedly deceptive, and asks the same question to consumers in a condition in which the allegedly deceptive element has been removed or corrected, and then these conditions are compared to identify the difference in what consumers believe to be true about the product.[7]

23. In this case, an accurate measurement of consumer deception due to the omission of a warning label could have been collected by randomly assigning consumers to either see the product without the warning label or to see the product with the

---

[4] Held, J., & Germelmann, C. C. (2018), at p. 123. Deception in consumer behavior research: A literature review on objective and perceived deception. *Projectics/Proyéctica/Projectique*, *21*(3), 119-145.

[5] https://www.ftc.gov/system/files/documents/public_statements/410531/831014deceptionstmt.pdf

[6] See, for instance, Gardner, D. M. (1975). Deception in Advertising: A Conceptual Approach. *Journal of Marketing*, *39*(1), 40-46; Petty, R. D. (2015). The historic development of modern US advertising regulation. *Journal of Historical Research in Marketing*, *7*(4), 524-548.

[7] Diamond, Shari Seidman, and Jerre B. Swann (2022). *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, Second Edition*. American Bar Association.

warning label and statistically comparing what consumers believe to be true about the product across the two conditions.

24. Mr. Wallace's purported test of consumer deception does not hold constant the product label's claims and test the impact of a warning label on consumer beliefs about the product. It does not statistically measure consumer beliefs about the product at all. Thus, it cannot measure whether consumers are objectively deceived by any aspect of the product or its label, including the omission of a warning label.

## Mr. Wallace's Survey Incorrectly Tests Materiality

25. Mr. Wallace identified in his deposition testimony that he was "asked specifically to analyze this claim and determine its impact on consumer perception and consumer purchase intent." (deposition page 46, lines 1-3). The claim, per Mr. Wallace, consisted of "The back panel of the Krave product...Everything that's written on that back panel" (deposition page 44, lines 4-9). Thus, Mr. Wallace indicated that his task regarding materiality was to identify whether the language used on the back label impacts consumer purchase intentions.

26. This is an incorrect conceptualization of materiality for this matter, as the material attribute in question is the presence/absence of a warning label, not other language used on the product's label.

27. However, Mr. Wallace's survey questions also fail to gather the information he stated he was tasked with collecting. Specifically, Mr. Wallace fails to test whether any language on the defendant's product label has any impact on consumer purchase intentions.

28. Instead, Mr. Wallace purports to measure the materiality of the "side effects" caused by kratom that are *already known by respondents*. He does this by asking a series of questions:

    a. Q11a: Are you aware of any reported side effects from kratom use? (Yes, no, don't know/can't remember)

    b. Q12a: In brief summary, what do you believe that the potential side effects from kratom use are? (open-ended)

    c. Q13a: Have you ever experienced these side effects in your use of Krave Botanicals or another botanical kratom product? Yes, no, don't know/can't remember)

d. Q14a: Do these potential side effects impact your interest in purchasing and consuming products that use approximately 500 mg of kratom per use[8], as the Krave Botanical brand does? (Yes, no, don't know/can't remember)

29. These questions were asked PRIOR to the respondent being shown any labeling for the product in question, and PRIOR to the respondent being told that "on average 25% percent of kratom users reported that it presented some addictive cravings after their first several uses but 75% did not report any addictive side effects after more than several uses." In other words, the survey is not testing whether the label, or any warning about the label, has any impact on consumer purchasing intent, as the respondents had not seen the label or any warnings about the product when asked the questions that Mr. Wallace used to measure materiality.

30. Further, Mr. Wallace's survey only targeted individuals who indicated that they intended to purchase kratom again in the next 18 months. This creates a tautology and circular logic such that only individuals who intend to purchase kratom are asked if the side effects that they are already aware of would impact their intention to purchase kratom. The results of this question are therefore irrelevant and useless to assess the materiality of any component of the product's label, including a warning label about the product's addictive nature and withdrawal symptoms, to the broader target market for the product who might choose to *not* purchase a product if they believed that it was addictive or caused withdrawal symptoms.

31. Since Mr. Wallace's survey only tests the impact of "side effects" that kratom consumers are already aware of on their purchase intent, it is unclear what "side effects" are being measured by the survey. These "side effects" may not include the claims at issue in this matter and are both under- and over-inclusive of the actual claim that may be material to this case.

32. If consumers are *not aware* of the habit-forming nature of kratom, then this potential effect cannot impact their interest in purchasing and using the products. Thus, the question cannot test the materiality of a label that informs consumers of the addictive nature of the product.

33. If consumers are *aware of other side effects* besides the habit-forming nature of kratom (e.g. constipation, identified above), they may be reporting the materiality of attributes that are not at issue.

34. Thus, Mr. Wallace fails to test materiality as relevant to this case, fails to test the question that he recognizes he was specifically hired to analyze, and fails to test

---

[8] Mr. Wallace's survey conflates the amount of kratom in a single capsule in Defendant's product (500mg) with the "per use" amount. These may not be the same. While this question would have external validity for individuals who only take one capsule at a time, it may not be relevant for individuals who take larger amounts in a single use.

these questions with the correct target market. His purported measurement of materiality is therefore unreliable, invalid, and not useful for assessing the materiality of the presence or absence of a warning label.

# Mr. Wallace Lacks Requisite Fundamental Knowledge of Survey Methods

35. Mr. Wallace's report and deposition testimony show a profound and deeply troubling lack of knowledge and incorrect understanding of concepts that are required for a purported "survey expert."

36. Mr. Wallace specifically admitted in deposition that he did not know what a statistical p value is.[9] P values as a measure of statistical significance and likelihood of error due to chance are a concept commonly taught in undergraduate level statistics classes. For instance, at the university at which I teach (Wichita State University in Wichita, Kansas), p values are taught in ECON 231: Business Statistics, which is a prerequisite for the Marketing Research undergraduate course that I regularly teach. As such, Mr. Wallace does not have as much knowledge regarding statistics as do average undergraduate business students studying marketing research for the first time.

37. Similarly showing a lack of required knowledge for a survey researcher, Mr. Wallace stated in his deposition that he does not know what a data codebook is (deposition page 67, line 1), gave an incorrect definition of "professional respondent risk" regarding online panels,[10] and gave the backwards statement that he chose a "very conservative" test (deposition page 151, line 22) instead of recognizing that his design decision actually artificially increased the size of the effect observed in the study without providing any useful "but-for" condition for comparison purposes.[11]

---

[9] Deposition page 253, lines 13-17: "Does your report include P-values?" "I'm not sure what that means." "If I say P-value, do you have any understanding as a survey expert what that means?" "No."

[10] Page 129, lines 5-9: "When I say "professional respondent risk" in connection with online survey panels, what is your understanding of that term?" "Qualified respondents who meet all the screening criteria." This is factually incorrect: the survey risk due to professional respondents on online survey panels refers to the risk of individuals who are nonrepresentative due to 1) their have taken so many surveys that they have more understanding and different perspectives than typical consumers, or 2) respondents giving purposefully dishonest responses in order to maximize their chances of being chosen for and completing a survey to maximize their income.

[11] Per Mr. Wallace, "If I had used another addictive product maybe with less awareness, those –that level of survey noise may have been much, much higher and it may have increased the overall impact of the primary results." (Page 152, lines 2-5) Mr. Wallace therefore recognizes that if he had chosen a control condition with less awareness, more individuals may have incorrectly thought that the control statement was false and deceptive. As such, the difference between the control condition and the test condition would be *smaller*,

38. Mr. Wallace's report fails to contain any confidence intervals, margins of error, p values, or statistical testing of any kind. This fails to meet the Daubert standards of reporting a known or potential error rate for one's methodologies or techniques.[12]

39. Mr. Wallace acknowledged in his deposition that he did not run any question-specific margins of error or confidence intervals, but instead that he believes that the margin of error for the entire survey is "plus or minus five percent at a 95 percent confidence level" (deposition page 252, line 25 – p. 253, line 1). This statement is blatantly statistically incorrect, as the actual margins of error for his three key questions, which he did not calculate, range from 5.5% to 6.8%.[13] There is no way to justify stating that his entire survey had a margin of error that was less than the margin of error present in any of his key questions.

40. Mr. Wallace incorrectly asserts that he gives a "known rate" of error for the survey by reporting the "2.2 percent level of inconsistency or error as confirmed by the control group" (deposition page 254, lines 4-5). This answer is simply incorrect. This 2.2% figure is Mr. Wallace's best attempt to measure the *correct* answer to the question of what percentage of respondents would believe that an FDA compliant warning

and would potentially *decrease* the overall impact of the test condition when compared to the control condition. A conservative test is one that decreases the potential impact of the hypothesized condition; in contrast, Mr. Wallace picked a test condition that artificially inflated the impact of the hypothesized condition by finding a control category that almost no one (2.5%) believed was false or deceptive.

All that Mr. Wallace is testing through his choice of "control condition" is the percentage of people who incorrectly believe that a true statement is false. This choice in no way measures the impact of a warning label on consumers' beliefs regarding the product. While Mr. Wallace observes the form of experimentation (a control and test group), his implementation is useless for assessing the impact of a warning label, or any other attribute of the label in question, on the extent to which consumers are actually deceived. A proper comparison group would hold constant all aspects of the current label but also add a warning label, then would compare the percentage of individuals in each condition who were actually deceived about the product's addictive nature. This would allow a "but-for" comparison that tests the impact of not having a warning label on consumer deception.

[12] Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579 (1993) ("An expert may testify about scientific knowledge that assists the jury in understanding the evidence or determining a fact in issue in the case. Factors that a judge should consider include whether the theory or technique in question can be and has been tested, whether it has been subjected to peer review and publication, its known or potential error rate, the existence and maintenance of standards controlling its operation, and whether it is widely accepted in the relevant scientific community.")

[13] Using SPSS and the data provided by Mr. Wallace, I calculated bootstrapped confidence intervals with 25,000 iterations for the key questions asked in Mr. Wallace's survey. Q14a asks whether potential side effects impact respondents' interest in purchasing and consuming kratom products. Mr. Wallace accurately reports that 37 / 146 individuals (25.3%) said "Yes." The corresponding 95% confidence interval for this percentage is between 18.5% and 32.2%, or a margin of error of plus or minus 6.8%. I similarly calculated a bootstrapped 95% confidence interval for Q16a and Q18a, which identifies the percentage of respondents who believes that the label was "false and deceptive" before (13.7%, 95% CI=8.2%, 19.2%) and after (17.1%, 95% CI=11%, 23.3%) seeing additional addiction information. These figures have different margins of error, of plus or minus 5.5% and plus or minus 6.1%, respectively.

about cigarette smoke is, in fact, false and/or deceptive.  This question does not in any way capture information about known or potential error rates for the survey (sampling error, measured in p values, confidence intervals, and/or margins of error) and instead shows a lack of basic understanding about experimental design and analysis.

# Concluding remarks

41. Mr. Wallace's survey is fatally flawed, invalid, and unable to measure actual consumer deception resulting from the presence/absence of a warning label on Defendant's kratom products, or the materiality of the presence/absence of this warning label. He uses an incorrectly specified target population of individuals who have purchased and intended to continue purchasing the product, measures perceived deception instead of objective deception, fails to conceptualize materiality properly, and fails to measure materiality in the way that he acknowledges he was asked to do. Further, he demonstrates a lack of understanding of basic scientific principles that call into question his status as a purported "expert." In sum, Mr. Wallace asks the wrong questions to the wrong people, resulting in results that are useless at best, and misleading at worst.

42. Respectfully submitted on March 18, 2026 in Wichita, KS

A.   Lynn Matthews, Ph.D.



# PHILLIPS, FRACTOR & COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

# A. LYNN MATTHEWS, PH.D.

July 2025

## Research Interests

Managerially focused research on branding, with a focus on person-brand management, branding for start-up and small firms, and consumer perceptions of firm behaviors that impact brand perceptions (e.g., CSR, controversy, scandal). I am also interested in mixed methods research, survey and questionnaire-based research, and other issues of methodology.

## Education

Ph.D. 2018    Marketing, University of Nebraska - Lincoln
              Dissertation: "Perceived Authenticity in Human-Branded Services"

M.S. 2013     Survey Research & Methodology, University of Nebraska - Lincoln
              Minor in Marketing

B.A. 2011     Sociology, Grove City College
              Minors in Business, Religion

## Professional Memberships

American Marketing Association (AMA)
American Association for Public Opinion Research (AAPOR)

## Email

lmatthews@rule26.com

3452 East Foothill Blvd. Suite 220
Pasadena, California 91107-3154
T: (626) 744-3540 || O: www.rule26.com



**PHILLIPS, FRACTOR & COMPANY, LLC**
A Limited Liability Company

## Experience

| | |
|---|---|
| Fall 2018 to Present: | Assistant Professor<br>Department of Marketing<br>W. Frank Barton School of Business<br>Wichita State University (Kansas) |
| 2012 to Present: | Consultant<br>Phillips, Fractor & Company, LLC<br>Pasadena, CA |
| 2014 Spr & Smr:<br>2015 Spr & Smr:<br>2017 Fall: | Instructor<br>University of Nebraska – Lincoln |
| 2012 Summer: | Survey Research Intern<br>David Nazarian College of Business and Economics<br>California State University, Northridge |
| 2011 – 2013: | Gallup Research Scholar<br>University of Nebraska - Lincoln |
| 2010 – 2012: | Marketing Research Staff<br>Center for Computationally Advanced Statistical Techniques (c4cast)<br>Pasadena, CA |

## Courses Taught

| | |
|---|---|
| Marketing Research | Principles of Marketing |
| International Marketing | Introductory Marketing |



**PHILLIPS, FRACTOR & COMPANY, LLC**
A Limited Liability Company

**Publications**

1. "The Importance of Being Important: Measuring Materiality in Consumer Deception Litigation". A. Lynn Matthews, Valerie Flugge, and M. Christine Phillips. *American Business Law Journal*, forthcoming.

2. "Unraveling the Knot of Consumer Reviews: How Stars and Descriptions Impact Purchase Intentions". Stephen A. Hampton, A. Lynn Matthews, and Kalynn Coy. *Journal of Services Marketing*, forthcoming.

3. "How Transfer Behavior Impacts Consumer Perceptions and Intentions Toward College Athletes Who Pursue NIL Activities." A. Lynn Matthews and Jodi E. Pelkowski. *Journal of Sport Management*, 38(5) 365-376.

4. "Sympathy or Shock: How Transgression Diagnosticity Impacts Consumer Perceptions and Intentions Regarding Person-Brands." A. Lynn Matthews and Sarah Leubke. *Journal of Product & Brand Management*, 32( 8): 1399-1411.

5. "Brand Management of Natural Spaces: The Impact of Natural Space Authenticity on Consumer Outcomes." A. Lynn Matthews, Seth Cockrell, and Kristen L. Walker. *Journal of Public Policy & Marketing*, 42(3): 279-295.

6. "Signaling Authenticity for Frontline Service Employees." A. Lynn Matthews and Meike Eilert. *Journal of Services Marketing*, 36(3): 416-431.

7. "Curtain Promises: Draped in Puffery?" William Ingersoll, A. Lynn Matthews, and G. Michael Phillips. *Journal of Case Studies* 39(2): 44-53.

8. "When and How Frontline Service Employee Authenticity Influences Purchase Intentions." A. Lynn Matthews, Meike Eilert, Les Carlson, and Jim Gentry. (2020). *Journal of Business Research*, 114(2020):111-123.

9. "Organizational Learning and Inter-Organizational Knowledge Transfer," in R. Dant and C. Ingene (Eds.) Ravi Sohi and A. Lynn Matthews. *The Handbook of Research on Distribution Channels*. Edward Elgar Publishing 2019.



PHILLIPS, FRACTOR & COMPANY, LLC
A Limited Liability Company

10. "What Are You Doing Now? Activity-Level Responses and Recall Failures in the American Time Use Survey."  Tarek Al Baghal, Robert Belli, A. Lynn Phillips, and Nick Ruther.  *Journal of Survey Statistics and Methodology* 2(4):519-537.

11. "Where, Oh Where Have the Vampires Gone? An Extension of the Tiebout Hypothesis to the Undead." In G. Whitman and J. Dow (Eds.).  A.L. Phillips, M. C. Phillips, and G. M. Phillips.  *Economics of the Undead* (pp. 201-210). Lanham, MD: Rowman & Littlefield.

12. *The Quest of the Unaligned*. Mountain Home, AR: Borderstone Press, 2013. (Novel, includes pedagogical discussion and essay questions for use in undergraduate sociology classes)

13. "What's Good in Theory May Be Flawed in Practice: Potential Legal Consequences of Poor Implementation of a Theoretical Sample."  A. Lynn Phillips, G. Michael Phillips, Melanie S. Williams.  *Hastings Business Law Journal* 9(1):77-97.

14. "The Impact of Neighborhood Ethnic Composition on Availability of Financial Planning Services."  James T. Chong, A. Lynn Phillips, G. Michael Phillips.  *Journal of Financial Service Professionals* 65(6):71-83.

15. "The Persistence of Traditional Gender Stereotypes: Evidence from the Distribution of Academic Honors at a Female-Majority University."  A. Lynn Phillips, G. Michael Phillips.  *The American Journal of Business Education* 3(10):45-53.

16. "Homeschooling is an Art, not a Science: The Impact of Homeschooling on Choice of College Major."  A. Lynn Phillips.  *Sociological Viewpoints* 26(2):19-25.

Working Paper

"Naturally Deceptive: The Problem with 'Naturally Flavored' Food Labels".  A. Lynn Matthews and Kristen Walker.  Status: being revised for resubmission to the *Journal of Public Policy and Marketing*.



**PHILLIPS, FRACTOR & COMPANY, LLC**
A Limited Liability Company

**Conference Presentations (**denotes presenter)**

1. "Survey Research In and Out of the Classroom in MKT 403: Marketing Research," in the Conference Roundtable titled, "Community Research Out of the Classroom." AAPOR National Conference, May 2024.

2. "A Three-Pronged Approach to Survey and Questionnaire Design in Wage-Hour and other Labor Litigation Cases." Karina Cordova**, William R. Ingersoll, A. Lynn Matthews**, and G. Michael Phillips. AAPOR National Conference, May 2024.

3. "How to Be Real: Understanding and Assessing Enactment Strategies of Service Provider Authenticity." A. Lynn Matthews and Meike Eilert**. AMS National Conference (Virtual), Dec. 2020.

4. "How to Build Your Reputation: Survey Findings and Implications." A. Lynn Matthews** and Blaine Aikin. Fi360 Conference for Investment Professionals (Virtual), May 2020.

5. "Entrepreneurship in Marketing: A Comprehensive Review of the Literature." A. Lynn Matthews** and Amit Saini. Global Research Symposium on Marketing and Entrepreneurship, August 2017.

6. "… And Here Are Pictures of My Last Vacation! Investigating the Disclosure of Personal Information of Entrepreneurs in Online Marketplaces." A. Lynn Phillips**, Meike Eilert, and James Gentry. Poster, ACR North America Conference, October 2015.

7. "Consumer Perceptions of Controversiality in Business." A. Lynn Phillips** and Meike Eilert. Poster, AMA Public Policy & Marketing Conference, June 2015.

8. "Everyday Consumption and Perceptions of Oldness: Barnhart and Penaloza Extended." A. Lynn Phillips**, James Gentry, and Michelle Barnhart. ACR Latin America Conference, July 2014.

9. "Troubles with Time-Use: Examining Potential Indicators of Error in the ATUS." A. Lynn Phillips**, Tarek al Baghal, and Robert Belli. AAPOR 68th Annual Conference, May 2013.



PHILLIPS, FRACTOR & COMPANY, LLC

A Limited Liability Company

10. "What Are You Doing Now? Audit Trails and Activity Level Responses and Error in the American Time Use Survey." T. al Baghal**, A. L. Phillips, N. Ruther, R.F. Belli, L. Stuart, A. Eck, and L-K Soh. AAPOR 68th Annual Conference, May 2013.

11. "Georgia on Their Minds: The Impact of War and Financial Crisis on Georgian Confidence in Social and Governmental Institutions." A. Lynn Phillips**, Davit Tsabutashvili, and Allan L. McCutcheon. AAPOR 67th Annual Conference, May 2012.

12. "Homeschooling is an Art, not a Science: The Impact of Homeschooling on Choice of College Major." Pennsylvania Sociological Society 59th Annual Conference, October 2009.

**Awards and Honors**

| | |
|---|---|
| Undergraduate Instructor of the Year, Barton School of Business | 2023 |
| Summer Research Grant, Barton School of Business | 2022, 2023, 2024 |
| Real Estate Research Fellow, Wichita State University | 2018-2020 |
| Dean's Fellowship, UNL College of Business Administration | 2017 |
| Fellowship, American Association of University Women, Lincoln Branch | 2017 |
| UNL College of Business Administration Graduate Student Research Award | 2017 |
| UNL Department of Marketing Award for Excellence in Teaching by a Graduate Student | 2016 |
| UNL Department of Marketing Award for Excellence in Service by a Graduate Student | 2016 |
| Fellow, 2016 Haring Symposium, Indiana University (student presenter) | 2016 |
| UNL Department of Marketing Award for Excellence in Research by a Graduate Student | 2015 |
| Fellow, AMA-Sheth Doctoral Consortium, London Business School | 2015 |
| Doctoral Fellowship, University of Nebraska–Lincoln, Marketing Ph.D. Program | 2013-2018 |
| Graduate Research Assistantship, University of Nebraska– Lincoln, Survey Research and Methodology Program | 2011-2013 |
| Best Undergraduate Paper Award, Pennsylvania Sociological Society | 2009 |

**EXHIBIT 6**

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ndeckant@bursor.com
          lsironski@bursor.com

**OLIVIER & SCHREIBER LLP**
Monique Olivier (SBN 190385)
monique@os-legal.com
Christian Schreiber (SBN 245597)
christian@os-legal.com
475 14th Street, Suite 250
Oakland, CA 94612
Telephone: (415) 484-0980

*Attorneys for Plaintiff*

**LYNCH CARPENTER, LLP**
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
Scott G. Braden (SBN 305051)
scott@lcllp.com
1234 Camino del Mar
Del Mar, CA 92014
Tel:   (619) 762-1910
Fax:   (858) 313-1850

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.J., C.D., C.B., and D.F., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ASHLYNN MARKETING GROUP, INC.,<br><br>Defendant. | Case No. 3:24-cv-00311-GPC-MSB<br><br>**REPLY DECLARATION OF DANIEL OVERBEEK, MD**<br><br>Date:  April 24, 2026<br>Time:  1:30 p.m.<br>Courtroom:  12A<br><br>Judge:  Hon. Gonzalo P. Curiel |

# REPLY DECLARATION OF DANIEL OVERBEEK, M.D.

I, Daniel Overbeek, MD, declare as follows:

**Purpose and Corrective Statement**

1. I submitted an Expert Report in this matter on January 8, 2026 (the "Initial Report") in support of Plaintiffs' Motion for Class Certification. I hereby authenticate and reaffirm the opinions expressed in my Initial Report are true and correct and adopt them as if fully set forth herein.

2. I am being compensated at a rate of $500 per hour for my work in this case. My compensation is not contingent upon my findings, and all conclusions expressed herein are my own, based on my education, training, and clinical experience.

**Response to the Declaration of Dr. Edward Boyer**

3. I have reviewed the Declaration of Dr. Edward W. Boyer filed in support of Defendant's Opposition to Plaintiffs' Motion for Class Certification.

4. Dr. Boyer's declaration focuses on the pharmacological differences between kratom's alkaloids and other opioids such as morphine, hydrocodone, and oxycodone. He concludes that "Matthews's edited product label inappropriately compares kratom to morphine, hydrocodone, and oxycodone; differences in chemical structure, reasons for use, outcomes of use, receptor activity, withdrawal severity, and management of withdrawal clearly demonstrate that kratom and opioids belong to different chemical and pharmacologic classes."

5. Dr. Boyer's pharmacological observations do not alter the clinical reality that kratom use carries well-documented risks of physical dependence, tolerance, and withdrawal. These risks are not dependent on whether kratom's clinical effects and mechanisms of action are identical to that of classical opioids. As I explained in my Initial Report, kratom's primary alkaloids—mitragynine and 7-hydroxymitragynine—bind to mu-opioid receptors and can produce dependence and

1

withdrawal symptoms that are clinically significant and, in some cases, require medication-assisted treatment including buprenorphine. Initial Report at 8–11.

6.      Dr. Boyer's own declaration does not dispute that kratom can cause dependence or withdrawal. He acknowledges that "[w]ithdrawal from kratom has since 2007 been recognized as being generally mild and self-limited." Boyer Decl. at 10. The characterization of withdrawal as "mild" in some cases does not negate its existence, nor does it eliminate the need for consumers to be informed of the risk before purchase. In my clinical experience, kratom withdrawal presentations range from mild to severe, and some patients require residential treatment programs and medication-assisted therapy to discontinue use. Initial Report at 9–10.

7.      Dr. Boyer further observes that kratom alkaloids are "partial agonists" at the mu-opioid receptor, whereas morphine, hydrocodone, and oxycodone are "full agonists." Boyer Decl. at 9. While this pharmacological distinction is accurate, it does not eliminate the risk of addiction. Partial agonists can and do produce dependence and withdrawal. Buprenorphine, for example, is itself a partial mu-opioid receptor agonist, yet it is a Schedule III controlled substance precisely because of its dependence and abuse potential. The partial-agonist distinction goes to the degree of certain pharmacological effects (such as respiratory depression), not to whether dependence can develop.

8.      Similarly, Dr. Boyer's observation that kratom has not produced "widespread severe addiction" comparable to prescription opioids does not negate the risk that consumers should be informed of. My understanding is that the issue in this case is not whether kratom is pharmacologically identical to morphine, but whether consumers purchasing kratom products were entitled to know that regular use carries a risk of dependence and withdrawal. Even Defendant's own addiction science expert, Dr. Kirsten Smith, agreed at deposition that kratom labels should disclose the risk of tolerance and withdrawal.  Smith Dep. 69:1–6; 78:1–3; 87:12–18.

2

9.   Notably, Dr. Boyer does not offer any opinion on consumer perception, materiality, reliance, or economic injury. His declaration appears to be confined to pharmacology and does not address whether Defendant's failure to disclose addiction and withdrawal risks was material to reasonable consumers at the point of sale.

10.   Regarding the specifics discussed in Dr. Boyer's declaration, he identifies a phenomenon wherein individuals who use non-pharmaceutical opioids will seek out opioids from sellers known to have supplies of high-potency opioids. (Boyer Declaration Section 23-25) He inappropriately concludes that due to this, a warning label identifying risks of Kratom would "*paradoxically increase the number of individuals that would initiate kratom use*". This is an incorrect understanding of how individuals with substance use disorders respond to incentives. He is correct that individuals who use substances will often seek out sources which are known to have high purity illicit substances for sale. But this is not due to a desire to engage in risky behavior or a "fundamentally different appreciation of risk". This is because users often have limited financial resources and due to tolerance often will not experience significant effects from lower purity sources. Because of this, they seek out the most efficient way to spend their limited resources, which would logically be high purity / high potency substances. This is specifically distinct from a desire to seek out substances with an "addictive propensity". Hypothetically, individuals who use opioids, if offered the option between "addictive heroin" and "non-addictive heroin" would always pick the "non-addictive heroin", even if they are seeking out higher potency sources to efficiently spend their resources.

11.   Dr. Boyer also claims that the reasons individuals use other opioids are significantly different than those of Kratom. (Boyer Declaration Section 26c-d) Specifically, he claims that users of morphine / hydrocodone / oxycodone do not use to self-treat depression, anxiety or opioid withdrawal. This is not true, in my clinical experience, these are all reasons for use reported by individuals who use non-

OVERBEEK REPLY DECL.                                        CASE NO. 3:24-CV-00311-GPC-MSB

prescribed opioids. He also reports that the effects from use are different between Kratom and other opioids such as morphine/hydrocodone/oxycodone. Specifically, he claims that the other opioids (morphine/hydrocodone/oxycodone) do not have the following effects: improved mood/decreased anxiety, avoid opioid withdrawal, improved alertness. In my clinical experience, these are all effects experienced by those individuals who use these other opioids.

12. Additionally, Dr. Boyer compares the "abuse liability" and "withdrawal severity" of Kratom to the other opioids (morphine/hydrocodone/oxycodone). (Boyer Declaration Section 26g-h). He claims that Kratom has notably lower abuse liability than the other opioids ("+" vs "++++++" for oxycodone, without any explanation of what this scale means). He cites a study from Dr. Smith which does not attempt to compare the abuse liability of these drugs. While it is true that users of the other opioids, especially non-prescribed hydrocodone and oxycodone, have higher rates of substance use disorders, this does not eliminate the fact that many users develop Kratom Use Disorder.

13. Dr. Boyer also concludes that Kratom should be thought of as distinct from other opioids because withdrawal is "mild and self-limited" and he claims that lower doses of buprenorphine are needed to treat Kratom use disorder ("Typical doses of buprenorphine used to manage kratom withdrawal, if required at all, are often limited to 4mg per day; in contrast, doses of 32-40mg buprenorphine per day are commonly needed to manage opioid use disorder"). As mentioned above, this does not deny that kratom use does lead to dependence and withdrawal. In my clinical experience, withdrawal symptoms from both Kratom and the other opioids mentioned can range from mild to severe. Additionally, individuals with Opioid Use Disorder and Kratom Use Disorder can both be treated with buprenorphine with similar doses. Standard dosing would begin at approximately 16mg total per day, and doses from 4mg daily up to 32mg daily or potentially higher can be used to manage both Opioid Use Disorder and Kratom Use Disorder. For example, in the 2008 case

4

OVERBEEK REPLY DECL. CASE NO. 3:24-CV-00311-GPC-MSB

study published by Dr. Boyer, the patient had not used hydromorphone for 3.5 years, but had been using Kratom, and when they stopped using Kratom, they experienced withdrawal symptoms. This patient was stabilized on 16mg a day of buprenorphine. I have personally cared for patients requiring up to 24mg a day to control withdrawal symptoms from Kratom.

**Response to the Declaration of Dr. Kirsten Smith**

14.     I have reviewed the Declaration of Dr. Kirsten Smith filed in support of Defendant's Opposition to Plaintiffs' Motion for Class Certification as well as the transcript of her Deposition on March 12, 2026.

15.     Dr. Smith's first conclusion is "Kratom is not highly addictive and when assessed by DSM-5 severe substance use disorder (SUD) criteria is rare." (Smith Declaration Page 11) The definition of addiction is controversial, including because the term "addiction" caries significant societal stigma. Due to this, the DSM-5 has eliminated the term "addiction", using instead "Substance Use Disorder". Dr. Smith defines addiction as "DSM-5 severe substance use disorder". This is an over-simplification. Addiction can range in severity and is not limited to only severe substance use disorder. See for example, the CDC: "Opioid Use Disorder (OUD), a substance use disorder, sometimes referred to as "opioid abuse or dependence" or "opioid addiction" is a problematic pattern of opioid use that causes significant impairment or distress". Alternatively, the American Society of Addiction Medicine (ASAM) defines addiction as "Addiction is a treatable, chronic medical disease involving complex interactions among brain circuits, genetics, the environment, and an individual's life experiences. People with addiction use substances or engage in behaviors that become compulsive and often continue despite harmful consequences."

16.     Even based on her definition, her conclusion that Kratom Use Disorder (KUD) is rare is unfounded. There are a range of estimates of Kratom use; Dr. Smith estimates in her deposition that several million Americans engage in daily Kratom

5

use (Smith Deposition Pg 37-38). Multiple surveys cited in this case so far, including by Dr. Smith in her report, report that a not-insignificant proportion of individuals meeting DSM-5 criteria for KUD. Potential estimates include 25.5% of responders meeting past-year KUD criteria with 13.9% of those (3.5% of responders) with severe diagnostic severity (Smith et al 2023) and 29.5% of responders meeting past-year KUD criteria with 8.5% of responders with meeting severe KUD (Smith et al., 2022d). Even using only those meeting severe KUD criteria and a modest estimate of 2 million daily users, this still estimates 70,000-170,000 with severe KUD, let alone those with less severe Kratom Use Disorders.

17. Dr. Smith's second opinion claims "The etiologies of SUDs informed by complex risk and protective factors specific to the individual. Kratom cannot in itself cannot cause a person to become addicted." While these statements are each independently true, they do not lead to a conclusion claiming that Kratom use cannot be addictive. If that was true, then no drug could be addictive, as these statements are also true in regard to other addictive drugs as well (i.e. heroin/etc).

18. Dr. Smith also makes a similar argument to that made by Dr. Boyer, that addictive labeling would lead to an increase in Kratom use. This argument remains flawed as discussed above. To note, Dr. Smith claims "some participants believed that by adding "addiction" language to a label it may increase the likelihood that young people, people looking for a "legal high," or people with an addiction history might be more likely to purchase the product because of this language" (Smith Declaration page 20). This is again a flawed interpretation of the decision-making process of those who use substances. Even if an individual is seeking out a "legal high", that does not mean they would seek out something addictive. A desire to "get high" is not the same as a desire to seek out an addictive product. Similarly, "people with an addiction history" do not tend to seek out addictive products, even if they seek out products with psychoactive properties.

OVERBEEK REPLY DECL.                                CASE NO. 3:24-CV-00311-GPC-MSB

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 18th day of March, 2026, at ___Rockford_____, ___MI_____ .

*Daniel Overbeek, MD*
Daniel Overbeek, MD (Mar 18, 2026 20:55:36 EDT)
_____

Daniel Overbeek, MD

OVERBEEK REPLY DECL.                                                CASE NO. 3:24-CV-00311-GPC-MSB

**EXHIBIT 7**

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
          lsironski@bursor.com

**OLIVIER & SCHREIBER LLP**
Monique Olivier (SBN 190385)
monique@os-legal.com
Christian Schreiber (SBN 245597)
christian@os-legal.com
475 14th Street, Suite 250
Oakland, CA 94612
Telephone: (415) 484-0980

*Attorneys for Plaintiff*

**LYNCH CARPENTER, LLP**
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
Scott G. Braden (SBN 305051)
scott@lcllp.com
1234 Camino del Mar
Del Mar, CA 92014
Tel:   (619) 762-1910
Fax:   (858) 313-1850

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.J., C.D., C.B., and D.F., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ASHLYNN MARKETING GROUP, INC.,<br><br>Defendant. | Case No. 3:24-cv-00311-GPC-MSB<br><br>**REPLY DECLARATION OF WILLIAM ROBERT INGERSOLL, PH.D.**<br><br>Date:   April 24, 2026<br>Time:   1:30 p.m.<br>Courtroom:   12A<br><br>Judge:   Hon. Gonzalo P. Curiel |

## REPLY DECLARATION OF WILLIAM ROBERT INGERSOLL, PH.D.

I, William Robert Ingersoll, Ph.D., declare as follows:

**Purpose and Corrective Statement**

1. I submitted a Declaration in this matter on January 7, 2026 (the "Initial Declaration") in support of Plaintiffs' Motion for Class Certification, presenting a proposed methodology for calculating classwide economic losses under a full-refund model. I hereby authenticate and reaffirm the methodology and opinions expressed in my Initial Declaration are true and correct and adopt them as if fully set forth herein.

2. I am being compensated at a rate of $500 per hour for my work in this case through Phillips, Fractor & Company, LLC. My compensation is not contingent upon my findings or the outcome of this litigation.

**Response to the Declaration of Dr. Eric Forister**

3. I have reviewed the Declaration of Dr. Eric F. Forister filed in support of Defendant's Opposition to Plaintiffs' Motion for Class Certification.

4. Dr. Forister's principal critique is that a full-refund model is "economically inconsistent" because it assumes the product has "zero value" absent the alleged omission. Forister Decl. ¶¶ 18–21. It is my understanding from Plaintiffs' counsel that this mischaracterizes the legal basis for full-refund restitution, and that a full-refund model does not require proof that a product had zero utility. Rather, it is one permissible measure of restitution where the omitted information concerns a material safety risk that would have been important to a reasonable consumer's purchasing decision. The Ninth Circuit affirmed a full-refund jury verdict in *Montera v. Premier Nutrition Corp.*, 111 F.4th 1018, 1029-30 (9th Cir. 2024), even though the product at issue provided hydration and Vitamin C, because the jury found the misrepresentation to be material. The question is whether the information omitted was material, not whether the product had any residual utility.

INGERSOLL REPLY DECL.        CASE NO. 3:24-CV-00311-GPC-MSB

5.     Dr. Forister criticizes me for not performing a "net benefit calculation" or estimating willingness-to-pay. Forister Decl. ¶¶ 23–25. Those analyses are appropriate for a price-premium model, not a full-refund model. I understand that, at the certification stage, *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), requires only that a plaintiff identify a damages methodology consistent with the theory of liability. It does not require that the methodology be uncontested or that all merits disputes be resolved. I further understand that the merits question of which damages measure is ultimately appropriate—full refund, price premium, or some other model— is for determination at trial.

6.     Dr. Forister's critique of my retail-price estimation methodology raises questions about the representativeness of the online pricing data, the appropriate markup, and whether website prices constitute MSRP. Forister Decl. ¶¶ 37–47. These are disputes about the inputs to my methodology, not about whether the methodology *itself* is capable of producing a classwide damages figure. My methodology—applying a retail markup to wholesale revenue data to estimate aggregate retail sales—is arithmetic and classwide. The precise markup is a factual question that can be refined as additional data becomes available through discovery, including data from third-party retailers and distributors. My understanding is that, at class certification, the question is whether the methodology is workable and tied to the liability theory, not whether every input has been finalized. It is also my understanding that courts have held that individualized damage calculations do not defeat class certification, particularly where, as here, the defendant's own records help to enable classwide computation. *See, e.g., Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013); *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010).

7.     I note that Dr. Forister himself does not contend that classwide restitution is structurally impossible. His critiques go to the accuracy of certain assumptions and inputs, which appear to be merits disputes that can be addressed at trial with the benefit of a fully developed record.

2

INGERSOLL REPLY DECL.                                    CASE NO. 3:24-CV-00311-GPC-MSB

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 18th Day of March, 2026, at Glendora, California.

*William Robert Ingersoll*
William Robert Ingersoll (Mar 18, 2026 11:39:56 PDT)

William Robert Ingersoll, Ph.D.

INGERSOLL REPLY DECL.                          CASE NO. 3:24-CV-00311-GPC-MSB



# PHILLIPS, FRACTOR & COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

# WILLIAM R. INGERSOLL, PH.D.

June 2025

- Experience teaching and communicating complex analysis in the courtroom and at the university.
- Lead expert on economic damages in cases involving a variety of areas for both plaintiff and defense: employment, personal injury, wage hour, unreimbursed business expenses, lost profits, conjoint analysis, and consumer confusion cases.
- Contributed complex economic modeling and analysis to larger, complex litigation cases as a part of a team of Ph.D.s.
- Proficiency with STATA, Matlab, EViews, R, Excel, Qualtrics, and Lighthouse Studio.

Economist and Statistician
Phillips, Fractor & Company, LLC
2018 to present

Chair of Business and Entrepreneurship & Associate Professor of Economics (Fall 2025)
Assistant Professor of Economics (August 2016 to Spring 2025)
School of Business and Management - Azusa Pacific University (Azusa, CA)

Instructor, Dept. of Economics
University of Arizona (Tucson, AZ)
Summers 2008, 2009, 2010, 2012 and Spring 2009

## Education

Ph.D. 2016    Economics
University of Arizona, Tucson
Dissertation: *Technology Advancement in Network Markets and Agent Bargaining*

M.A.  2007    Economics
University of Arizona, Tucson

B.A.  2006    Economics (*magna cum laude*), Minor in Mathematics
Sonoma State University (Rohnert Park, CA)



**PHILLIPS, FRACTOR & COMPANY, LLC**

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

## Second Language and Email

Spanish (basic)
Email: wingersoll@rule26.com

## Fields of Specialization

Industrial Organization, Microeconomic Theory, Econometrics, Behavioral/Experimental Economics

## Publications and Book Review

1. "Pastors of Smaller and Larger Churches Face Different Challenges: Empirical Evidence" with D.R. Dunaetz. *Great Commission Research Journal*; 17(1), May 2025. https://place.asburyseminary.edu/gcrj/vol17/iss1/4

2. "Contemporary Challenges Facing North American Evangelical Churches: Differences Between Smaller and Larger Congregations" with K. Fightmaster and D.R. Dunaetz, *Interdisciplinary Journal of Research on Religion*; Vol. 21, Art. 4, May 2025.

3. "Currency, ForEx, and Cryptocurrency in Global Business" chapter in M.W. Cawman and P. Fine-Skalnik (Ed.), *Global Business and Marketing Strategy: Integrative Workbook of Exercises and Case Studies*. [Preliminary Edition] Cognella, Inc., 2023.

4. "Curtain Promises" with A.L. Matthews and G. Michael Phillips, *Journal of Case Studies*, November 2021, Issue 2.

5. "Bargaining with a Partially Incentivized Agent", (with Alex Roomets) *Journal of Economic Behavior and Organization*, Vol. 171 (March 2020) doi.org/10.1016/j.jebo.2020.01.018

6. "Technology Advancement in Network Markets", University of Arizona, mimeo, 2015.

7. Review of "Rediscovering Social Economics: Beyond the Neoclassical Paradigm" by Roger D. Johnson for *Faith and Economics*, Fall 2017.



ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

## Working Papers

"Generational Differences in Mental Health and Ministry Challenges: Boomer and Gen Z Missionaries Need Each Other" with D.R. Dunaetz.

"How Long Will They Rent? Quantitative Analysis of Residential Mobility, Tenant Demographic Traits, and Rent Control" with M.C. Phillips, T.A. Sargent, and G.M. Phillips.

## Presentations

"Generational differences in mental health and ministry challenges: Boomer and Gen Z missionaries need each other", with D.R. Dunaetz. Evangelical Missiological Society 2025 Southwest Regional Conference, Ontario, CA. 4/4/25

"Inflation and the Realization of Latent Market Power" presented at *Academy of Business Research Fall 2023 San Antonio Conference*. 10/31/23

"Cryptocurrency and International Trade and Development" presented at International Business Colloquium hosted by Azusa Pacific University. 10/18/22

"Cryptocurrency in Global Business" presented at International Business Colloquium hosted by Azusa Pacific University. 3/16/22

"A Test of Sequential Nash Bargaining" presented at *2013 Economic Science Association Conference*, Santa Cruz, CA.

## Project Contributions

BORDERS Initiative – Research Asst. to Judy Gans at the Udall Center for Studies in Public Policy.
-Location analysis of apprehension data
-Real estate impact analysis of permanent border checkpoint

E-Verify Policy Analysis - Research Asst. to Judy Gans at the Udall Center
-Employment impact of new employee registration policies

Economic Impact of Immigrants - Research Asst. to Judy Gans at the Udall Center
-State-by-state and regional analysis of economic contributions of immigrants
-Food stamp usage among immigrants

---



# PHILLIPS, FRACTOR & COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

**Courses Taught**

Labor Economics
Econometrics
Industrial Organization and Regulation
Managerial Economics
Environmental Economics
Virtual Economies
Financial Markets and Institutions
Financial Risk Management
Applied Portfolio Management


**Association Memberships**

American Statistical Association
National Association of Forensic Economics
National Association of Business Economics

**EXHIBIT 8**

## California Class

**Class Definition**: All persons in California who purchased Krave Botanicals kratom products from February 16, 2020, through the date of final judgment in this action.

**Class Representatives**: J.J., C.D., C.B.

**Class Counsel**: Lynch Carpenter, LLP; Bursor & Fisher, P.A.

**Claims**: (1) Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 et seq.) (4-year SOL; class period begins Feb. 16, 2020); (2) Consumer Legal Remedies Act (Cal. Civ. Code § 1750 et seq.) (3-year SOL; class period begins Feb. 16, 2021).

## New York Class

**Class Definition**: All persons in New York who purchased Krave Botanicals kratom products from November 4, 2021, through the date of final judgment in this action.

**Class Representative**: D.F.

**Class Counsel**: Lynch Carpenter, LLP; Bursor & Fisher, P.A.

**Claims**: (1) N.Y. Gen. Bus. Law § 349; (2) N.Y. Gen. Bus. Law § 350 (3-year SOL; class period begins Nov. 4, 2021).

## Multistate Fraud-by-Omission Class

**Class Definition**: All persons in California, New York, and Illinois who purchased Krave Botanicals kratom products during the following periods through the date of final judgment in this action:

- California: February 16, 2021, to present (3-year SOL)
- New York: February 16, 2018, to present (6-year SOL)
- Illinois: February 16, 2019, to present (5-year SOL)

**Class Representatives**: J.J., C.D., C.B., D.F.

**Class Counsel**: Lynch Carpenter, LLP; Bursor & Fisher, P.A.

**Claims**: Common law fraud by omission under the laws of California, New York, and Illinois.[1]

---

[1] Class periods are calculated from the filing of the first complaint on Feb. 16, 2024, applying each state's statute of limitations for common law fraud: California, 3 years (Cal. Code Civ. Proc. § 338(d)); New York, 6 years (N.Y. CPLR § 213(8)); Illinois, 5 years (735 ILCS 5/13-205).